Sharan E. Lieberman (SL-6623)
Michael J. Cates
SECURITIES AND EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000
Email: liebermans@sec.gov
      catesm@sec.gov

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case Number: 23-cv-01491 |
| | ECF CASE |
| Plaintiff, | |
| - against - | COMPLAINT |
| KEVIN A. VAN DE GRIFT, and GIL FRIEDMAN, | |
| Defendants. | |

Plaintiff United States Securities and Exchange Commission (the "SEC"), for its Complaint against Defendants Kevin A. Van de Grift ("Van de Grift") and Gil Friedman ("Friedman") (collectively, "Defendants"), alleges:

## SUMMARY

1.     This case involves Van de Grift's insider trading in Verifone Systems, Inc. ("Verifone") securities based on material nonpublic information that his close friend Friedman unlawfully disclosed. Van de Grift purchased Verifone securities in advance of the April 9, 2018

1

public announcement that the private equity firm, Francisco Partners Management, L.P. ("Francisco Partners"), had agreed to acquire Verifone for $23.04 per share in cash, a premium of approximately 54 percent over its prior-day closing price. When the proposed Verifone acquisition was announced the company's stock price increased significantly, and Van de Grift sold his stock for hundreds of thousands of dollars in profit.

2. Friedman, who was a consultant at Francisco Partners, learned of Francisco Partners' plan to acquire Verifone and provided that information to Van de Grift, whom Friedman knew was an active "day trader." On Sunday, March 4, 2018, Friedman spoke with the senior deal partner at Francisco Partners leading the Verifone acquisition (the "Verifone Deal Partner"). During this call, Friedman and the Verifone Deal Partner discussed the Verifone acquisition. One minute after his call with the Verifone Deal Partner, Friedman called Van de Grift and told him about his conversation with the Verifone Deal Partner. The next morning, Van de Grift started buying Verifone stock. Within a week, he had purchased 60,000 shares worth approximately $1 million.

3. On April 9, 2018, Francisco Partners announced its agreement to purchase Verifone. The following day, the price of Verifone stock increased 52% from the previous day's closing price. Van de Grift sold all of his Verifone shares that morning and made illegal profits of approximately $300,000.

**NATURE OF PROCEEDINGS AND RELIEF SOUGHT**

4. By engaging in the conduct described in this Complaint, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

5.  The SEC seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws by engaging in the transactions, acts, practices, and courses of business alleged in this Complaint; (b) ordering Van de Grift to disgorge any ill-gotten gains he received with prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(3), (5), and (7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)]; (c) ordering Defendants to pay civil money penalties pursuant to Exchange Act Section 21A [15 U.S.C. § 78u-1]; (d) ordering officer and director bars against Defendants pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. §§ 78u(d)(2)]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

6.  The SEC brings this action pursuant to the authority conferred upon it by Exchange Act Sections 21(d) and 21A [15 U.S.C. §§ 78u(d); 78u-1].

7.  This Court has jurisdiction over this action pursuant to Sections 21(d), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d); 78u-1; 78aa]. Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged herein.

8.  Venue is proper in this District pursuant to 28 U.S.C. §1391(c)(3) and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)] because certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including executions of securities transactions through a broker that maintains two offices in this District. This case also involves a security listed on the New York Stock Exchange, which is headquartered in New York, New York, and Francisco Partners maintains an office in this District.

**DEFENDANTS**

9.      Kevin A. Van de Grift, age 54, resides in Atlanta, Georgia. At all relevant times, Van de Grift was an active securities day-trader and a part-time bankruptcy restructuring consultant. Van de Grift has previously worked for public accounting firms and for a publicly-traded company. Van de Grift is also a Certified Public Accountant. During the SEC's investigation, Van de Grift asserted his Fifth Amendment privilege against self-incrimination to questions asked by the SEC staff.

10.     Gil Friedman, age 50, resides in Sunny Isles, Florida. At all relevant times, Friedman was a consultant for Francisco Partners. Friedman has previously worked for a public accounting firm, publicly-traded companies, and Francisco Partners' portfolio companies.

**RELEVANT ENTITIES**

11.     Verifone Systems, Inc. ("Verifone") is a payment systems company. At all relevant times, Verifone was a public company based in California with its common stock listed on the New York Stock Exchange and traded under the symbol "PAY." In August 2018, several months after the announcement of its planned acquisition of Verifone, Francisco Partners completed the acquisition and Verifone's stock was delisted.

12.     Francisco Partners Management, L.P. ("Francisco Partners") is a private equity firm based in San Francisco that specializes in investments in technology businesses. Francisco Partners maintains an office in New York, New York.

## FACTS

**A.     Friedman Was Affiliated with Francisco Partners and Agreed to Not Disclose Its Information.**

13.     From 2008 through approximately December 2022, Friedman consulted for and worked as the Chief Financial Officer ("CFO") for companies owned in whole or in part by Francisco Partners. For example, following Francisco Partners' 2009 acquisition of a majority stake in Company A, a fleet management applications and services company, Francisco Partners retained Friedman as CFO for Company A. Friedman served as Company A's CFO until 2013. Similarly, following Francisco Partner's 2013 acquisition of Company B, a provider of electronic payment systems, Francisco Partners hired Friedman as the CFO of Company B until 2017.

14.     In April 2017, Francisco Partners agreed to sell Company B to a publicly-traded company. Friedman was involved in the sale of Company B, and through his work on the deal, Friedman had direct and recurring contact with the Verifone Deal Partner.

15.     After Friedman left his position as CFO of Company B, he continued on as a consultant for Francisco Partners. From approximately June 2017 through May 2018, Francisco Partners periodically contacted Friedman and asked him to assist with due diligence regarding potential investments or acquisitions, and also to determine his interest in becoming CFO of current or potential Francisco Partners portfolio companies.

16.     In connection with his consulting role, Francisco Partners required Friedman to execute a non-disclosure agreement ("NDA"), which Friedman did in June 2017.

17.     Under the NDA, which was in full force and effect at all relevant times, Friedman owed a duty to Francisco Partners to keep certain information confidential, including information about Francisco Partners' "existing or potential investments" in "third parties." The NDA expressly prohibited disclosure of this information to persons outside of Francisco Partners'

5

"affiliates, officers, directors, employees or agents." Friedman also acknowledged in the NDA that he was "aware of, and agrees to comply with, the restrictions imposed by the United States federal securities laws . . . on a person possessing material non-public information about a public company."

18.  From May 2018 to approximately December 2022, Friedman was a partner with Francisco Partners Consulting ("FPC"). FPC provides consulting services to Francisco Partners portfolio companies. FPC terminated Friedman after learning the details of Van de Grift's unusual trading.

19.  At all relevant times, Friedman owed a duty to Francisco Partners not to disclose Francisco Partners' material nonpublic information without a corporate purpose, including information regarding Francisco Partners' potential acquisition of Verifone.

**B.  Friedman and Van de Grift Had a Close, Personal Relationship.**

20.  At all relevant times, Van de Grift and Friedman were close friends. They lived a few houses away from each other and communicated frequently by phone. They vacationed together with their families. Shortly after Van de Grift sold his Verifone shares at a substantial profit, Van de Grift and Friedman's families took an Alaskan cruise together. In 2021, Van de Grift agreed to become a trustee for Friedman's estate upon Friedman's death.

*Van de Grift and Friedman Discussed Francisco Partners' Business,
Including Nonpublic Francisco Partners' Information.*

21.  Van de Grift and Friedman frequently discussed their careers and job opportunities. For example, in June 2017, Friedman forwarded information to Van de Grift about a potential job opportunity for Friedman at a Francisco Partners' portfolio company.

22.  Van de Grift and Friedman also discussed Friedman's work at Company B and his relationship with the Verifone Deal Partner. For example, in October 2017, Friedman sent

6

Van de Grift an article regarding the sale of Company B with the comments that the Verifone Deal Partner "loves me :)" and "More awards..."

23.  Friedman also shared with Van de Grift nonpublic information, including information obtained from his relationship with Francisco Partners. In March and April 2018, Friedman sent Van de Grift nonpublic financial information about a company he was consulting for at the time and, in October 2018, Friedman forwarded Van de Grift a Francisco Partners document stamped "DRAFT CONFIDENTIAL."

*Friedman Knew Van de Grift Was a Day Trader.*

24.  At all relevant times, Van de Gift was an active day trader. Between January 2017 and March 2020, most of Van de Grift's investments were "day trades," stock purchases that he opened and closed within a single day. Friedman knew that Van de Grift was an active trader.

25.  Van de Grift and Friedman discussed the financial markets and specific investment opportunities. Aware of his friend's trading, Friedman had a pattern of providing investment recommendations to Van de Grift. Friedman frequently sent Van de Grift stock charts with comments such as "lets [sic] discuss" or "How can you not buy this[?]"

C.  **Friedman Possessed Material Nonpublic Information Concerning Francisco Partners' Acquisition of Verifone.**

26.  In December 2017, Francisco Partners began discussions with the Verifone Chief Executive Officer about acquiring Verifone. After initial due diligence, on February 2, 2018, Francisco Partners submitted an offer that represented a premium of approximately 30 percent over its market price. This proposed transaction was confidential and nonpublic.

27.  The Verifone Deal Partner and a member of Francisco Partners' Investment Committee signed the February 2, 2018 offer letter to pursue the Verifone acquisition. The letter stated that Francisco Partners was "highly confident" it would obtain financing for the

7

transaction, and given Francisco Partners' "deep familiarity" with the payments industry, any remaining due diligence would be "largely confirmatory."

28. By no later than March 1, 2018, Verifone formed a "Transaction Committee" of its Board of Directors to evaluate the offer, and engaged outside legal counsel and financial advisors.

29. After Francisco Partners delivered the offer letter, and as the due diligence continued, Francisco Partners sought individuals to replace Verifone's existing senior management. By March 3, 2018, Francisco Partners identified Friedman as a top candidate to become Verifone's CFO.

30. On Saturday, March 3, 2018, the Verifone Deal Partner sent a text message to Friedman stating that he needed to talk about a "mega deal" involving a "CA payments company." At the time the Verifone Deal Partner sent the text, Verifone was a payments company based in California. Further, the Verifone acquisition was the only "mega deal" involving a "CA payments company" that the Verifone Deal Partner was involved with when he sent the text.

31. The next afternoon, Friedman and the Verifone Deal Partner spoke by telephone for approximately 24 minutes. During that call Friedman learned material nonpublic information regarding Francisco Partner's intention to acquire Verifone.

32. On March 6, 2018, two days after the call between Friedman and the Verifone Deal Partner, a Francisco Partners employee working on the Verifone deal sent Friedman an email stating: "I think [the Verifone Deal Partner] has spoken to you[] about" the Verifone transaction. The next day, on March 7, 2018, Francisco Partners sent extensive Verifone data to

Friedman and gave Friedman access to the online "data room," which contained Verifone information created to allow Francisco Partners to conduct due diligence.

33. On April 19, 2018, the Financial Industry Regulatory Authority ("FINRA") requested information from Francisco Partners about its announcement that it planned to acquire Verifone. The next day, Friedman responded that he first received information about the Verifone transaction on "a call" he had with the Verifone Deal Partner. From January 2018 through April 20, 2018, the only call listed on Friedman's phone records with the Verifone Deal Partner was their 24-minute March 4, 2018 call.

34. At all relevant times, Friedman knew that Francisco Partner's acquisition of Verifone would cause the price of Verifone's stock to increase and knew that the potential acquisition of Verifone was confidential. Indeed, on March 7, 2018, Friedman signed a nondisclosure agreement that specifically covered the Verifone information he was provided.

**D. Friedman Illegally Tipped Van de Grift Information About the Verifone Deal, and Van de Grift Traded on that Information.**

35. One minute after Friedman's March 4, 2018 call with the Verifone Deal Partner ended, Friedman called Van de Grift. Friedman and Van de Grift spoke for approximately 15 minutes. Friedman and Van de Grift spoke again for almost 30 minutes the evening of March 4, 2018, and again the next morning, Monday, March 5, 2018, at around 9:00 a.m. for approximately 15 minutes.

36. Upon information and belief, on one or more of these three phone calls, Friedman conveyed material nonpublic information regarding Francisco Partners' planned acquisition of Verifone to Van de Grift.

37. When Friedman conveyed this information, he breached his duty to Francisco Partners to keep certain information confidential, including information about Francisco

9

Partners' "existing or potential investments," to third-parties. Friedman knew, consciously avoided knowing, or was reckless in not knowing that the information he conveyed to Van de Grift included material nonpublic information, was disclosed in breach of his duty to Francisco Partners, and that Van de Grift would use the information for trading.

38. Friedman received a personal benefit from his tip of material nonpublic information to Van de Grift, including the benefit of providing a gift of information to his close friend.

39. Minutes after Friedman and Van de Grift's phone call on the morning of March 5, 2018, Van de Grift logged into his brokerage account and began buying Verifone securities.

40. When Van de Grift purchased these shares, he was aware of the material nonpublic information Friedman passed to him, that Francisco Partners was going to acquire Verifone, and Van De Grift traded on the basis of that information.

41. At the time Van de Grift purchased these shares he knew, consciously avoided knowing, or was reckless in not knowing that the information Friedman conveyed to him about Verifone was material nonpublic information, and that Friedman disclosed this information in breach of Friedman's duty to Francisco Partners.

42. On March 5, 2018, Van de Grift bought 25,000 Verifone shares in his own account. On March 6, 2018, in accounts that Van de Grift possessed and controlled but were maintained in the name of his minor children, he bought an additional 10,000 shares and another 10,000 shares in his own account. On March 9, 2018, he bought another 15,000 shares for his own account.

43. Between March 5, 2018 and March 9, 2018, Van de Grift acquired 60,000 Verifone shares worth approximately $1 million.

44. After the close of trading on April 9, 2018, Francisco Partners and Verifone announced that they entered into a definitive agreement under which an investment group led by Francisco Partners would acquire Verifone for $23.04. The Verifone closing price on April 9, 2018 was $15.00. The next morning, the price increased and that day Verifone's closing price was $22.78, a 52 percent over the closing price on April 9, 2018.

45. On April 10, after the price reflected the news of the acquisition and had increased dramatically, Van De Grift sold all of his shares of Verifone, reaping approximately $300,000 of illicit gains.

E. **Van de Grift's Trading in Verifone Securities Were Different From His Other Trades and Were His Most Profitable Trades.**

46. From January 2017 through March 2020, as a day trader, Van de Grift actively traded the securities of public companies. During that time, Van De Grift traded in 37 different companies and made 581 "roundtrip" trades. However, Van de Grift's trading in Verifone securities differed from his usual trading patterns during this period in numerous ways.

47. During this three year period, other than the trades described above, Van de Grift never bought or sold Verifone securities or the securities of any other payments systems companies.

48. From January 2017 through March 2020, Van de Grift sold over two-thirds of the securities he purchased within 24 hours. During that time, he held securities for more than 30 days only approximately three percent of the time. By contrast, Van de Grift held his Verifone securities for approximately 37 days.

49. During this period, Van de Grift traded 98 percent of the time from his own account. However, when he purchased the Verifone securities, he traded in the accounts that were in the name of his minor children.

11

50. Van de Grift was not a successful securities trader; excluding the Verifone windfall, he lost almost $1.3 million from his trades from January 2017 through March 2020. Among these trades, the Verifone trades described above had the highest percentage return on the lowest number of trades.

51. Van de Grift frequently researched securities he purchased using his brokerage firm's online research tools. However, before purchasing Verifone stock on March 5, 2018, Van de Grift did not research Verifone using those tools.

## CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

52. The SEC realleges and incorporates by reference each and every allegation in paragraphs 1 through 51, inclusive, as if they were fully set forth herein.

53. At all relevant times, Friedman owed a duty of trust and confidence to Francisco Partners to maintain the confidentiality of Francisco Partners' nonpublic information and to refrain from disclosing such information to others without a corporate purpose.

54. Friedman unlawfully tipped his close friend Van de Grift with material nonpublic information about Francisco Partners' acquisition of Verifone in violation of his NDA and in breach of the duty he owed to Francisco Partners.

55. Friedman knew, consciously avoided knowing, or was reckless in not knowing that the information he tipped was material nonpublic information and that he was breaching his duty to Francisco Partners by disclosing material nonpublic information to Van de Grift.

56. Friedman received a personal benefit from his tip of material nonpublic information to Van de Grift, including the benefit of providing a gift of information to his close friend.

57. Friedman knew, consciously avoiding knowing, or was reckless in not knowing that that the information he communicated would be used for trading.

58. Van de Grift purchased Verifone stock on the basis of material nonpublic information that he received from Friedman. Van de Grift knew, consciously avoided knowing, or was reckless in not knowing that Friedman disclosed to him material nonpublic information in breach of a duty of trust and confidence for a personal benefit.

59. Van de Grift knew, consciously avoided knowing, or was reckless in not knowing that the information was material and nonpublic.

60. By virtue of the foregoing, Defendants, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon persons. By virtue of the foregoing, Defendants, directly or indirectly, violated, and unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that this Court enter a Final Judgment:

**I.**

Finding that Defendants violated the provisions of the federal securities laws as alleged herein;

### II.

Permanently restraining and enjoining Defendants from, directly or indirectly, engaging in conduct in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### III.

Ordering Defendant Van de Grift to disgorge all ill-gotten gains, plus prejudgment interest;

### IV.

Ordering Defendants to pay civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

### V.

Ordering that Defendants be prohibited from acting as officers or directors of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

### VI.

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial by jury in this action of all issues so triable.

Dated: February 22, 2023                    Respectfully submitted,

*[signature: Sharan Lieberman]*

Sharan E. Lieberman SL-6623
Michael J. Cates *
U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294-1961
Telephone: 303-844-1036 (Lieberman)
303-844-1115 (Cates); 303-844-1000 (Main)
Email: liebermans@sec.gov
          catesm@sec.gov

*Attorneys for Plaintiff*
*U.S. Securities and Exchange Commission*

* Not admitted in S.D.N.Y (*Pro Hac Vice* pending)